IN THE UNITED COURT OF APPEALS
FOR THE THIRD CIRCUIT

ROBBIE THOMAS,

    Appellant,

vs.

JEFFREY A. BEARD, et al.,

    Appellees,

*FILED ELECTRONICALLY*

CIV. ACTION NO. 10-1375

### RESPONSE OF APPELLEE DR. LONGSTREET TO PLAINTIFF'S FILING OF MARCH 24, 2010

The instant matter is an appeal by Plaintiff from an Order granting summary judgment against him in the United States District Court for the Western District of Pennsylvania. This is a §1983 case filed by a *pro se* inmate in the Pennsylvania Department of Corrections, Robbie Thomas. Mr. Thomas' Complaint is not a model of clarity, but he essentially asserts that Dr. Peter Longstreet, a psychiatrist at SCI-Albion, gave him two medicines in combination with the intent of "euthanasia" – to provoke Mr. Thomas into killing himself, allegedly so that Dr. Longstreet could write a best-selling "non-fiction" book about it, from which he would collect the proceeds. He invokes the 1st, 5th, 8th, and 14th Amendments to the United States Constitution. On March 24, 2010, Plaintiff filed a document making arguments in support of his appeal, though he did not serve it on Dr.

Longstreet's counsel.  To the extent Plaintiff's filing might be construed as an informal brief, Defendant now responds.

The facts of record are well-documented in the District Court's file through medical records made exhibits to the Defendant's Motion for Summary Judgment. Robbie Thomas is an inmate who has been diagnosed with depressive disorder, psychotic disorder, and anti-social personality disorder.  In April of 2007, he was discovered to have been sending multiple "Inmate Requests to Staff Member" to a female counselor at SCI-Albion with inappropriate content, for which he received a misconduct and was sent to the RHU.  Dr. Peter Longstreet, a psychiatrist, was consulted and determined that the inmate was suffering from paranoid delusions, including that the female staff member requited his affections.   Accordingly, he put Mr. Thomas on a low dose of perphenazine (Trilafon), which is used to treat schizophrenia and psychoses and prevent deluded and paranoid thinking.

After three weeks on the drug (and three weeks in the RHU), he threatened to commit suicide and was placed under psychiatric observation for about 2 ½ days.  He was then returned to the RHU.  He also then refused to take the perphenazine, and blamed the drug for his suicide threat.  He accused Dr. Longstreet of creating his misconduct, told him he did not trust him, and was seen by another doctor.  He continued to behave in a paranoid fashion, was diagnosed by other psychiatrists with the same problems observed by Dr. Longstreet, and

refused to take anti-psychotic drugs which might help him, mistrusting the drugs and the medical personnel who recommend he take them.

Defendant also offered the report of Dr. Horacio Spina, a psychiatrist in Pittsburgh in practice at St. Clair Hospital, who has reviewed Mr. Thomas' treatment records, and who opines that Mr. Thomas was appropriately placed on Trilafon and that, had he continued to take it, the drug would have helped him. Dr. Spina further notes that Mr. Thomas's delusions appeared to be progressive, and developed into paranoia of a psychotic intensity.

The District Court granted summary judgment for Dr. Longstreet on Jan. 14, 2010, concluding that Plaintiff could make no case that his constitutional rights had been violated (Opinion and Order, Exhibit A). The Court further wrote that "Plaintiff's bald accusation that an attempt was made to make him kill himself is fantastic and is defeated by the uncontested medical records."

The facts briefly summarized here are fully documented in the Brief in Support of Defendant Longstreet's Motion for Summary Judgment, and supported by Exhibit A to that Motion.

Dr. Longstreet was one of the staff psychiatrists at SCI-Albion. He began treating Robbie Thomas in November of 2006. On April 30, 2007, Dr. Longstreet was asked to see Mr. Thomas "urgently" due to a misconduct. Mr. Thomas had become fixated on a female counselor, Ms. Randall, and had been sending her a

high volume of written "requests." Dr. Longstreet spoke with her to verify this. He talked with Thomas for about a half an hour and encouraged him not to send her so many requests "though it is clearly a form of therapy for him." Because of his increase in paranoid thoughts, Mr. Thomas agreed to try a low dose of perphenazine (brand name – Trilafon), which is used to treat schizophrenia and psychopathic behavior. Dr. Longstreet also noted he would speak to the hearing examiner regarding the misconduct. (Mr. Thomas was also sent to the RHU as a result.

After about three weeks in the RHU, On May 21, 2007, Mr. Thomas threatened to commit suicide and was taken to an observation cell. Dr. Longstreet saw him there. Mr. Thomas said "They burned me – I'm tired of it, man!" He was sobbing and angry – yelling about a particular C.O. who had "constantly provoked him." Thomas "could not say" whether he was a danger to himself. He gave him 10 mg of Valium. Dr. Longstreet ordered that he be placed in a psychiatric observation cell under constant watch. His Paxil was continued, but Mr. Thomas refused to continue taking Trilafon. He also refused to take Haldol, another kind of antipsychotic drug. He agreed to take Valium. He ordered that Mr. Thomas be given a toothbrush and toothpaste (even such simple amenities may be denied a potentially suicidal inmate) and offered showers.

4

Dr. Longstreet saw him the next morning, and noted that Thomas blamed him (Longstreet) for putting him in the hole (the RHU). He also blamed a particular correctional officer. He was angry and yelling. He denied having any thoughts of suicide or homicide, and was taking his medication – Paxil and Valium, but no antipsychotic drugs. Dr. Longstreet ordered that he remain in the observation cell, but reduced "constant watch," to "close observation." That afternoon, he ordered that Mr. Thomas be given a standard issue jumpsuit, pillow, shoes and blanket (Again, all things that may be denied a prisoner who it is feared may use them to commit suicide).

The following morning, Dr. Longstreet was satisfied that Mr. Thomas was not a genuine suicide risk and he discontinued his observation status. Thomas denied intending to kill himself, appeared much better, and was calm. He "makes the case for [his] misconduct." Dr. Longstreet also wrote, "Discuss misconduct – Actually, I listen." His diagnosis was depression and severe personality disorder. He understood he would be returned to the RHU.

On September 6, 2007, Dr. Longstreet saw Mr. Thomas in the RHU. Mr. Thomas said "I just don't trust you, doc." He had apparently earned another misconduct. He was still writing to the staff. His mood was okay and his affect bright. The diagnosis was anti-social personality disorder, dysthymic disorder and paranoid personality disorder. His Paxil was continued. On October 18, 2007, Mr.

Thomas was out of the RHU. Dr. Longstreet changed his Paxil administration to the fourth pill line on Mr. Thomas' request.

In December 5, 2007, Mr. Thomas told Dr. Longstreet that he perceived the doctor had failed him and he had lost trust in him. (By this time, Mr. Thomas was actively pursuing the grievance he filed and exhausted as a pre-condition to this lawsuit). He said "Don't call me up no more." Dr. Longstreet's note states "Lengthy – brings papers – blames me for his RHU time." He was taking his medications but wouldn't take Trilafon. The diagnosis remained anti-social personality disorder, dysthymia, and paranoid personality disorder.

On Feb. 25, 2008, Dr. Longstreet attempted to check up on Mr. Thomas, who refused to be seen by him. Accordingly, he ordered that another psychiatrist, Dr. Sean Su, treat him from now on. As a member of the psychiatric staff, Dr. Longstreet continued to serve on the Psychiatric Review Team (PRT) for Mr. Thomas. In this capacity, on Feb. 28, 2008, he noted "Reportedly still delusional – will keep on list. Refuses anti-psychotic meds."

Dr. Su saw Mr. Thomas on March 8, 2008. Mr. Thomas said he was "doing okay now." Dr. Su wrote:

> "Patient denies any current problems, but patient rambles on about how he believes that his problems last year was because of Trilafon that he took . . . Patient is currently unwilling to take psychiatric medication other than Paxil."

6

Dr. Su continued his Paxil.  His diagnosis was mood dysfunction disorder not otherwise specified and anti-social personality disorder.

On April 3, 2008, again as part of his duties on the program review team, Dr. Longstreet noted that Mr. Thomas had been given a "direct order not to have any contact with Ms. Anderson," reflecting Mr. Thomas' continuing problems communicating with female staff.  On April 30, Dr. Su noted Mr. Thomas reported "having depression, feeling 'frustration.'"  He had trouble "trusting people," but was vague when asked to discuss details.  Objectively, Dr. Su noted no suicidal ideation or homicidal ideation.  He noted "patient has rambling of speech with some looseness of associations; some paranoia appears evident."  He continued the prescription for Paxil, noting the patient remained unwilling to take any other medications.

Dr. Su saw him again on June 3, 2008.  He wrote that Mr. Thomas:

> "verbally claims to be doing well on his medications (Paxil) . . . Patient verbally downplays any symptoms, says he's 'Okay as long as people leave me alone.'  Patient vaguely indicates having paranoid ideation.  Patient refuses to take any medication that is 'antipsychotic.'"

His affect was guarded and odd.  His speech was somewhat circumstantial.  His diagnoses were psychotic disorder not otherwise specified, and anti-social personality disorder.

7

Dr. Longstreet entered a progress note as part of the psychiatric review team on June 5, 2008. Dr. Longstreet wrote:

> "Inmate appears to fulfill criteria for erotomania[1] – will move to other side of prison. Love object appears to be Ms. Anderson – now sending her several requests per week. My concern is if he perceives she is in any danger or is being mistreated, he could act out violently secondary to psychotic mental state."

Dr. Su saw Mr. Thomas on July 2, 2008. He noted "patient reports having paranoid ideation regarding guards and staff here, however, patient appears to be doing well on his meds." He denied suicidal or homicidal ideation and his affect was guarded. He ordered continuation of the Paxil and noted Mr. Thomas remained unwilling to take any other psych meds. This appears to be his last visit at SCI-Albion, as his next psychiatric treatment note is with Dr. Reis, at SCI-Huntingdon.

On July 9, 2008, Dr. Reis saw Mr. Thomas at SCI-Huntingdon, who noted he said "I just want my Paxil 40 mg. at night." He noted Mr. Thomas was pleasant, cooperative, alert and his mood was "intense." He exhibited no signs of delusions or paranoia and his memory appeared to be intact. His diagnoses were depressive disorder and psychotic disorder, by chart history, as well as anti-social personality disorder. Dr. Reis noted the patient was not presently on any mood-stabilizers or antipsychotics, by the patient's own choice. "He was very angry that

---

[1] Merriam-Webster's Online Dictionary defines "erotomania" as  "1 : excessive sexual desire;
2 : a psychological disorder marked by the delusional belief that one is the object of another person's love or sexual desire."

he was previously prescribed Trilafon by his psychiatrist." He wanted to take Paxil, only. Dr. Reis thought it likely that his depressive disorder and psychotic disorder represented a schizoaffective disorder. He ordered Paxil and a follow-up in 30 days.

Dr. Eugene Polmueller saw Mr. Thomas in October. He noted he wanted to stay on his meds and hoped to be back in population soon. His diagnoses were dysthymia and anti-social personality disorder. Dr. Reis again saw Mr. Thomas on Nov. 19, 2008. He quoted Mr. Thomas saying "I just want to vent to you about my situation. These misconducts I got for sexual harassment are all untrue." He noted that the patient was stable, and "very perseverative about his history of problems at Albion and here." He noted that Mr. Thomas did not want to take a mood stabilizer or antipsychotic. His diagnoses were schizoaffective disorder and anti-social personality disorder. He continued the prescription for Paxil.

Dr. Reis saw him again on Dec. 16, 2008. Mr. Thomas expressed his hope that the PRC (Program Review Committee) would cut his time in the RHU. Dr. Reis described his mood as "mild hypomania." He observed no delusions or paranoia. Dr. Reis's diagnoses remained the same. He noted "patient stabilizing. Patient does not want med change despite MD opinion about a mood stabilizer being helpful."

Dr. Reis next saw Mr. Thomas on Jan. 14, 2008. He said "I have mood swings but I don't want nothing but my Paxil." This time, Dr. Reis found Mr. Thomas positive for both delusions and paranoia. He noted Mr. Thomas was stable. He saw him in the RHU through his cell door and noted that Thomas believed Dr. Reis could and/or should compel the C.O.s to return some paperwork to him. He was again offered mood stabilizers but he declined.

On Jan. 28, 2009, Mr. Thomas saw Dr. Reis again. He noted he had been "reading books about Lithium and also about how best to talk to your doctor." He wanted to consider a different mood stabilizer and said he would "read upon on Risperdal and Depakote." (Risperdal is for schizophrenia and Depakote is an anticonvulsant with some properties as a psychiatric drug). Dr. Reis wrote that he "strongly urged" Thomas to consider a mood stabilizer and had suggested the two drugs as alternatives."

On Feb. 11, 2009, Dr. Reis wrote that Mr. Thomas said "I don't want no more poison. I am not taking Risperdal, Lithium or Depakote. Just keep me on the Paxil." He noted no delusions but positive paranoia. Dr. Reis note that he saw him in the RHU and that "patient needs a mood stabilizer; patient is suspicious of meds and M.D. motives." His diagnosis was schizoaffective disorder – "most recent episode hypomanic." He continued his Paxil prescription and noted "continue to urge patient to consider mood stabilizer

10

While Plaintiff invoked the 1st, 5th, 8th, and 14th Amendments, the only claim that is genuinely applicable to this case is one under the 8th Amendment. The 8th Amendment standard applicable in this type of case is well-known to the Court. The Eighth Amendment prohibits the imposition of "unnecessary and wanton infliction of pain contrary to contemporary standards of decency." Helling v. McKinney, 509 U.S. 25, 32, 125 L. Ed. 2d 22, 113 S. Ct. 2475 (1993). In Estelle v. Gamble, 429 U.S. 97, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976), the Supreme Court held that the Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to provide basic medical treatment to those whom it has incarcerated. The Court articulated the standard to be used:

> In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute "deliberate indifference." As the Estelle Court noted: "In the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.' " Id. at 105; see also Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993) ("The law is clear that simple medical malpractice is insufficient to present a constitutional violation.");

White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990) ("Certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness.").

"Deliberate indifference," therefore, requires "obduracy and wantonness," Whitley v. Albers, 475 U.S. 312, 319, 89 L. Ed. 2d 251, 106 S. Ct. 1078 (1986), which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk. See Farmer v. Brennan, 511 U.S. 825, 842, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994) (stating that "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm"). The courts of this Circuit have found "deliberate indifference" in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346-47 (3d Cir. 1987), cert. denied, 486 U.S. 1006, 100 L. Ed. 2d 195, 108 S. Ct. 1731 (1988)). Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir., 1999)

The facts of this case compellingly demonstrated that Dr. Longstreet was anything but "deliberately indifferent" to the Plaintiff's medical needs. Dr. Longstreet was constantly attentive to Mr. Thomas's mental health. Mr. Thomas

was at all times taking medication prescribed by Dr. Longstreet and others for his depression. Dr. Longstreet saw him regularly to assess the state of his mental health. In late April of 2007, it was discovered that Mr. Thomas had begun exhibiting paranoia and delusional behavior. Because of this, Dr. Longstreet prescribed Trilafon, an anti-psychotic medication which treats delusional and paranoid behavior. Robbie Thomas did not threaten to commit suicide because he was taking Trilafon. Trilafon would only have made Mr. Thomas more rational, not less so.

When Mr. Thomas claimed he was going to commit suicide (he did not actually make any attempt), blaming the Trilafon for his behavior, he was taken off the drug at his own insistence. Dr. Longstreet persistently tried to persuade Mr. Thomas to take perphenazine or another anti-psychotic drug, to no avail. When Thomas said he didn't trust Dr. Longstreet and wouldn't allow himself to be treated by him any longer, Dr. Longstreet referred him to Dr. Su. It must also be noted that this mistrust is further evidence of his paranoid behavior which is the very reason his physicians recommended an anti-psychotic like Trilafon. Dr. Su then also tried to persuade Mr. Thomas to take an anti-psychotic, but his paranoia persisted and he refused to take anything but his anti-depressant. When he went to SCI-Huntingdon, Dr. Reis initially observed no paranoid or delusional behavior in Mr. Thomas. Within only two months, this changed, and he too tried to persuade

Mr. Thomas to take a mood stabilizer or other anti-psychotic or schizophrenic drug, with the same results. No one has ever forced Mr. Thomas to take a medication that he didn't want, no matter how much he may actually need it. He has the right to refuse to take a medication even if his physicians deem it necessary, and he has exercised that right.

This lawsuit, and the bizarre allegations Mr. Thomas has made, is evidence in and of itself that Mr. Thomas is paranoid and delusional. He contends that Dr. Longstreet deliberately gave him contraindicated medications (which they are not), as an act of "euthanasia," to try to get Mr. Thomas to kill himself, so that Dr. Longstreet could write a best-selling "non-fiction book" from which he would profit. Note that in the response to Mr. Thomas's grievance over this issue, Maxine Overton noted that she spoke to Dr. Longstreet "and he said he does not plan to write a book on inmate Thomas and other inmates." (Exh. C, p. 9, to Defendant's Motion for Summary Judgment, below).

It was upon these bases that the District Court properly granted summary judgment to Dr. Longstreet, and the Court's decision should be affirmed.

This lawsuit is fundamentally an expression of Mr. Thomas's paranoid and delusional behavior and is a direct consequence of his failure to take medications which all of his psychiatrists have urged him to take. His claims, even taken in the light most favorable to him, fail to state a claim for medical malpractice and

certainly fail to meet the requirements to prove deliberate indifference to a serious medical need. Furthermore, Mr. Thomas merely alleges that the combination of drugs given to him led to his *threat* that he would commit suicide. He never actually attempted to harm himself in any way and he has consequently suffered no harm, even if his outlandish allegations were taken as true. The District Court properly concluded that Plaintiff could not sustain his burden of proving any of the elements of his claims, and summary judgment was properly granted to Defendant Dr. Longstreet. Appellee accordingly urges the Court to uphold and affirm the District Court's finding.

                                Respectfully submitted,

                              WEBER GALLAGHER SIMPSON STAPLETON
                              FIRES & NEWBY LLP

BY: _____
      Samuel H. Foreman, Esquire
      sforeman@wglaw.com
      PA77096

      WEBER GALLAGHER SIMPSON
      STAPLETON FIRES & NEWBY, LLP
      2 Gateway Center
      Suite 1450
      Pittsburgh, PA 15222
      (412) 281-4541
      (412) 281-4547 FAX

# **CERTIFICATE OF SERVICE**

    I, Samuel H. Foreman, Esquire, hereby certify that on this date a true and correct copy of the foregoing **RESPONSE OF APPELLEE DR. LONGSTREET TO PLAINTIFF'S FILING OF MARCH 24, 2010** was sent by first class United States mail, postage prepaid, to the following:

Robbie Thomas,
Cy4327
1100 Pike Street,
Huntingdon, PA  16654-1112;

Douglas B. Barbour,
Deputy Attorney General,
Office of Attorney General
Manor Complex 564 Forbes Avenue,
Pittsburgh, PA  15219;

Kathryn M. Kenyon,
Pietragallo Bosick & Gordon,
38th Floor, One Oxford Center,
Pittsburgh, PA  15219

        /S/ Samuel H. Foreman
        Samuel H. Foreman, Esquire

Dated: 07/08/2010